UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PAMELA K. KIVETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-348-JDT-TAB |
| | ) | |
| MARION COUNTY SHERIFF'S | ) | |
| DEPARTMENT and | ) | |
| FRANK J. ANDERSON, individually and | ) | |
| as Sheriff of the Marion County | ) | |
| Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT BY PLAINTIFF
PAMELA K. KIVETT (Doc. No. 46), CROSS MOTION FOR SUMMARY JUDGMENT
BY DEFENDANTS MARION COUNTY SHERIFF'S DEPARTMENT AND FRANK J.
ANDERSON (Doc. No. 49), MOTION BY PLAINTIFF TO STRIKE DEFENDANTS'
CROSS-MOTION (Doc. No. 62) AND MOTION FOR LEAVE TO FILE AMENDMENT
TO CROSS MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS (Doc. No. 68)[1]**

Not quite three years ago, Marion County Jail Corrections Sergeant Pamela K.

Kivett was fired after she released an inmate who should have been returned to a state

prison to complete his sentence for failing to pay child support.  Sgt. Kivett has since

filed a lawsuit under 42 U.S.C. § 1983 alleging that the manner of the firing violated her

rights to due process under the Fourteenth Amendment.  Sgt. Kivett also claims that the

Defendants, Sheriff Frank Anderson and the Marion County Sheriff's Department ("the

Department"), punished her more harshly than male correctional officers guilty of the

---

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

same misconduct and thereby engaged in sex discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended.

Sgt. Kivett filed a partial summary judgment motion on April 4, 2006.  Her motion seeks the court's finding that her due process rights were violated and that she has established a prima facie case of gender discrimination.  Left for further resolution would be whether the Defendants' had a non-discriminatory reason to fire her, whether this was the actual reason for her firing or merely a pretext, and finally, with regard to both of her claims, her damages.

The Defendants filed a cross motion on May 8, 2006, seeking summary judgment on all of Sgt. Kivett's claims.  They also filed a motion on June 23, 2006, for leave to amend their cross motion for summary judgment.  Sgt. Kivett has opposed the motion to amend and, in addition, has asked the court to strike Defendants' cross summary judgment motion because of their failure to file it by the case management deadline for summary judgment motions.

The issues have been briefed.  This court has federal question jurisdiction over Sgt. Kivett's claims under 28 U.S.C. § 1331.  The court rules as follows.

**TABLE OF CONTENTS**

I.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  PRELIMINARY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    A.  Timeliness of Defendant's Cross Summary Judgment Motion . . . . . .  8

    B.  Defendant's Motion to File Amendment to Cross Motion . . . . . . . . .  13

III.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    A.  Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        1.  The Special Deputy Statute . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        2.  Property Rights Arising Under the Agreement . . . . . . . . . . . .  21

            a.  Seniority Provisions . . . . . . . . . . . . . . . . . . . . . . . . . .  23

            b.  Disciplinary Provisions . . . . . . . . . . . . . . . . . . . . . . . .  25

        3.  Qualified Immunity and Departmental Liability . . . . . . . . . . .  29

    B.  Title VII Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

        1.  Direct Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

        2.  Indirect Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

            a.  Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

            b.  Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

## I.  BACKGROUND

Sgt. Kivett joined the Department in 1999 as a jail control operator and was promoted to corrections officer in 2000.  (Compl. ¶¶ 9-10.)  At that time, jail officers did not appear to have been represented by a recognized bargaining unit.  (*See* Pl.'s Ex. 20 Article I.)[2]  They served at the pleasure of the sheriff.  (*See* Defs.' Ex. A.)  They were, as they are now, required to be special deputies.  Ind. Code § 36-8-10-10.6(f)(2).  Indiana law provides that a sheriff may fire a special deputy at any time, without notice, and without cause.  *Id.* § 36-8-10-10.6(a).

In September 2001, then Sheriff Jack L. Cottey recognized Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135 (the "Local") to be the exclusive bargaining representative of the jail corrections and control officers.  Sheriff Anderson and the Local signed a new contract, the Collectively Bargained Agreement ("Agreement"), in July 2003.  (Agreement 2, 16.)  It set forth, among other matters, a seniority system for filling job vacancies and procedures for promotion, discipline, and layoffs.  (*Id.* Articles III, VI, VII.)  Prior to its signing, Sgt. Kivett was promoted to sergeant  (Compl. ¶ 11.)  Officers holding this position were covered by the terms of the agreement.  (Agreement Article I.)  The Agreement expired December 31, 2006, but was in place during the period of activities that are the focus of this litigation.  (*Id.* Article XIX.)

---

[2]  Unless indicated otherwise, all exhibits, depositions, and memoranda cited in this Entry refer to exhibits filed in connection with Plaintiff's Brief in Support of Motion for Summary Judgment (Doc. No. 47) or listed in Defendants' Designation of Evidence (Doc. No. 50).  The Agreement is Plaintiff's Exhibit 20 and Defendants' Exhibit K.

On February 26, 2004, Sgt. Kivett was working as a shift supervisor. (Kivett Dep. 33.) Her duties involved overseeing other corrections officers, security, and the movement of inmates. (*Id.* at 16.) This included making sure that inmates who might otherwise be eligible for release were not wanted by other jurisdictions or "on loan" from another correctional facility where they were serving time for unrelated crimes. (Amy C. Crowe Dep. 18-19.)

Sgt. Kivett came to work about 5:30 a.m. (Kivett Dep. 35), and about 8 a.m., she met with the commander of the inmate records unit, Lieutenant Amy C. Crowe, who had been working the night shift (*id.*; Crowe Mem. 2). Both sides agree that at this meeting, Lt. Crowe discussed an inmate being held at the jail, Marcus Carter, and that Lt. Crowe handed Sgt. Kivett a packet containing Mr. Carter's records. Mr. Carter had been transferred from the Plainfield Correctional Center to the jail for pleas and sentencings on charges of resisting law enforcement and criminal conversion.[3] (Pl.'s. Ex. 6 at 3-11, 20-24.) The packet indicated that Mr. Carter had been credited with good time and sentenced to time served. (*Id.* at 3, 9, 22.) The packet also contained records showing that Mr. Carter was serving a three-year sentence at the Plainfield Correctional Facility, and that his earliest projected release date was February 12, 2005. (*Id.* at 13-14, 16.) On a state Department of Correction form regarding Mr. Carter, someone had stamped the instruction "DO NOT RELEASE OFFENDER FROM COURT BEFORE CONTRACTING THE PLAINFIELD CORRECTIONAL FACILITY." (*Id.* at 18.) The form was signed by a state correctional officer, Verlyn H. Brown. (*Id.*)

---

[3] Carter was also charged with public intoxication and an additional count of resisting law enforcement authorities, but these charges were dismissed.

2

The Defendants and Sgt. Kivett greatly dispute, however, Lt. Crowe's instructions to Sgt. Kivett during this meeting.  According to Lt. Crowe, she told Sgt. Kivett to call Officer Brown and ask if Mr. Carter needed to be returned.  (Crowe Dep. 99.)  Lt. Crowe said she instructed Sgt. Kivett that if Plainfield did not require him further, she was to release him to the street immediately because Marion County had no reason otherwise for holding him.  (*Id.* at 75, 99.)  "[T]wo days had gone by, and this could possibly be an over-detention if Plainfield did not want this individual back."  (*Id.* at 74.)

Sgt. Kivett insists that Lt. Crowe, who was her supervisor, ordered her to release Carter.  (Kivett Dep. 36.)  She recalled Lt. Crowe saying she was "sick and tired of these people over detaining these inmates" and that she needed Sgt. Kivett to take care of this problem.  (*Id.*)  As Sgt. Kivett started to look at the paperwork, "[s]he then interjected I need you to do that favor for me. Just get him the ---- out of here."  (*Id.* (expletive deleted).)  Sgt. Kivett said she noticed the instruction in Mr. Carter's packet to call Plainfield, but her "impression from the conversation from [sic] Lieutenant Crowe was that that had already been taken care of and the inmate was over detained."  (*Id.* at 37-38.)  Sgt. Kivett said she did not notice his earliest projected release date in the records she reviewed.  (*Id.* at 39.)  However, she did see that Plainfield had a "hold" on Mr. Carter when she checked a jail computer database.  (*Id.* at 41.)  The packet also contained a notation that Plainfield had a hold on Mr. Carter, but someone had already drawn a line through "Plainfield."  (Pl.'s Br. Supp. Ex. 6 at 3; Kivett Dep. 44.)  Sgt. Kivett

said she confirmed the disposition of the inmate's Marion County court cases, checked for outstanding warrants, and added the notation, "No Hold per Lt. Crowe."  (*Id.* at 41-44.)

On Sgt. Kivett's authority, Corrections Officer John Burke released Carter from the jail that afternoon.  (*Id.* at 50-51.)  According to Officer Burke and Corrections Officer Karen Powell, as Mr. Carter walked out of the jail, Sgt. Kivett asked him to step back inside and she rechecked the packet.  (Burke Mem. 1; Powell Mem. 1.)  Officer Burke said Sgt. Kivett told Mr. Carter that "per" her lieutenant, Plainfield no longer had a hold on him.  (Burke Mem. 2.)  Another corrections officer, Amber Helton, did not recall Sgt. Kivett calling him back inside.  (Helton Mem. 1.)  She said that as Carter was leaving, he stepped back in the door, indicated that he still had three years to serve, and asked Sgt. Kivett if she was certain that he was to be released.  (*Id.*)  Sgt. Kivett told him that her lieutenant had checked with Plainfield and "they do not want you."  (*Id.*)

Officer Brown called the jail the next day to tell officers that Mr. Carter needed to be returned.  (Crowe Mem. 2.)  Capt. David Crisler was then informed that Mr. Carter had been released despite Plainfield's hold and the inmate's protests that he still had time to serve.  (Crisler Mem. 1.)  During the course of the day, Lt. Crowe and Officers Burke, Powell, and Helton provided written statements about Mr. Carter's release.  (*See* Crowe, Burke, Powell, Helton Mems.)  Capt. Crisler told Deputy Chief David Pankoke that Lt. Crowe had "specifically told Sgt. Kivett to check the inmate's status." (Crisler Mem. 1.)  Between 5 p.m. and 6 p.m., Sgt. Kivett received a letter from Sheriff Anderson.  (Kivett Dep. 137-38.)  The letter stated that Deputy Chief Pankoke had found her in violation of the department's rules for (1) compliance with rules, orders, and

4

directives, (2) competent performance, (3) efficient performance, and (4) truthfulness. (Defs.' Ex. I.)  It also said her employment was being terminated "effective immediately, February 27, 2004."  (*Id.*)

Prior to receiving this letter, Sgt. Kivett and Lt. Crowe talked by telephone. (Kivett Dep. 53, 123.)  The two do not agree exactly on what was said.  According to Sgt. Kivett, Lt. Crowe asked her what she had done about Mr. Carter, and Sgt. Kivett replied that she had released him as Lt. Crowe had ordered.  (Kivett Dep. 53.)  Lt. Crowe replied that this had not been her order and hung up.  (*Id.*)

According to Lt. Crowe, she asked Sgt. Kivett what Plainfield officials had said when she called the state facility.  (Crowe Dep. 147.)  Sgt. Kivett replied that she had not made the call because Lt. Crowe had authorized the release.  (*Id.*)  Lt. Crowe explained that her comments the day before regarding Mr. Carter's release only applied to Marion County's need to keep the inmate and that Plainfield should have been called. (*Id.*)  Sgt. Kivett replied that she, Sgt. Kivett, had been "unclear" about Lt. Crowe's instructions.  (*Id.*; *see also* Crowe Mem. 3.)  Lt. Crowe could not recall anything else being said.  (Crowe Dep. 147.)

Although Sgt. Kivett and Lt. Crowe disagree about the contents of their conversation, both agree it was brief.  (*Id.* at 148; Kivett Dep. 53-54.)  Lt. Crowe said no one instructed her to call Sgt. Kivett.  (Crowe Dep. 165.)  She made the call as part of her investigation, not as a hearing regarding discipline.  (*Id.*)  Sgt. Kivett did not speak to

any other officers afterward about Mr. Carter's release prior to receiving the termination letter.  (Kivett Dep. 54.)

Under the terms of the Agreement, the Sheriff has the "ultimate authority" to discipline corrections officers.  (Agreement Article VII § 2(e) at 8.)  However, the contract also sets forth a process for allowing a review and non-binding recommendation by a Peer Review Board prior to any final discipline.  (*Id.*)  The first step of the process is mandatory.  "Upon receipt of a recommendation to suspend, demote or discharge a Corrections Officer from a subordinate, the Sheriff or his designee shall offer the Corrections Officer an administrative hearing before a Peer Review Board."  (*Id.*)  The second step is not automatic.  It requires the officer at issue to request such a hearing by submitting a written request to the Sheriff or his designee within 30 days after receiving written notice of the proposed discipline.  (*Id.*)

Lt. Crowe did not offer Sgt. Kivett a hearing.  (Crowe Dep. 197-98.)  Nor did Sheriff Anderson's termination letter.[4]  (Defs.' Ex. I.)  Nonetheless, Sgt. Kivett was aware of this right at least by March 1, 2004, when she met with her union representatives, Mark Shilling and Rudy Valadez, and they told her that they would request a Peer Review Board hearing on her behalf.  (Kivett. Dep. 76-77.)  According to Mr. Valadez, he requested the hearing in an e-mail dated March 2, 2004.  (Defs.' Ex. M.)

---

[4]  By December 10, 2004, subsequent disciplinary letters would inform officers of their right to appeal the discipline within thirty days.  (*See* Defs.' Exs. T, W.)

6

Jail officials have denied receiving this request, or at least receiving it in the proper form.  Deputy Chief Pankoke and Captain Edward G. Walker stated that Sgt. Kivett's "initial request" was denied because it was not received within thirty days, as required by the agreement.[5]  (Pankoke Decl. ¶ 9; Walker Decl. ¶ 7.)  Deputy Chief Pankoke also said that the department never received a "proper request" from Sgt. Kivett personally, as required also.  (Pankoke Decl. ¶ 10.)

By September 10, after Sgt. Kivett had hired an attorney, the Department agreed to a hearing.  (Defs.' Ex. M.)  It was held September 28, 2004, before two corrections officers and two lieutenants.  (Defs.' Ex. O.)  During the hearing, Sgt. Kivett testified that Lt. Crowe had ordered her to release Carter.  (*Id.*)  The board declined to consider some documentation by the Department that had not been provided to Sgt. Kivett.  (*Id.*)  It recommended that Sgt. Kivett be reinstated with back pay but demoted in rank and reprimanded.  (*Id.*)

On October 14, 2004, Sheriff Anderson sent Sgt. Kivett a letter stating that he had reviewed the board's recommendation and had decided "to stand by" his decision to terminate her employment.  (Defs.' Ex. J.)  Five months later, this litigation ensued.

---

[5]  This is an indirect acknowledgment that some form of request was received because otherwise there would have been nothing to deny.

## II.  PRELIMINARY ISSUES

### A.  Timeliness of Defendant's Cross Summary Judgment Motion

Sgt. Kivett has asked the court to strike the Defendant's cross motion for summary judgment as untimely.  (Pl.'s Reply Supp. 2.)  Sgt. Kivett has also asked the court to adopt her statement of undisputed material facts because of Defendants' failure to comply with Southern District of Indiana Local Rule 56.1 and designate the facts that are disputed.  (Id.

The relevant orders and filings are as follows:

• On February 2, 2006, Magistrate Judge Tim Baker granted the parties' agreed second motion to extend the case management deadlines. Discovery was extended to March 1, 2006.  The deadline "for the filing of any Motions for Summary Judgment" was extended to April 4, 2006. (Order of Feb. 2, 2006, on Agreed Second Mot. 1-2.)

• On March 1, 2006, the Defendants filed a third agreed motion to extend the deadlines, which Judge Baker denied on March 3, 2006.   He noted, "Merely reciting that there have been unexplained 'scheduling conflicts' does not establish good cause for a third extension of the agreed upon and Court-approved case management deadlines."  (Order of March 3, 2006.)

8

- On March 27 and 28, 2006, Defendants filed renewed and amended renewed motions to extend deadlines, citing the March 9, 2006, appearances of Anthony W. Overholt and Kevin C. Schiferl as co-counsel for the Defendants and their realization during deposition that they needed to explore "additional avenues of discovery" before moving for summary judgment." (Am. Renewed Mot. ¶ 3.) They specifically requested time to seek documents from, and perhaps depose, officials of Sgt. Kivett's union. (*Id.*) Judge Baker again denied the request, noting that the Defendants had waited a year to depose Sgt. Kivett and had yet to explain the "purported 'scheduling conflicts'" that they had cited in their prior motion. (Order of April 3, 2006.)

Despite Magistrate Judge Baker's repeated denials, the Defendants filed the cross motion for summary judgment on May 8, 2006, 34 days after the April 4 deadline. The motion was filed in conjunction with their response to Sgt. Kivett's summary judgment motion, which was timely filed. Additionally, Defendants failed to identify the disputed facts. Instead they relied on their own Statement of Material Facts Not in Dispute, which, not surprisingly, provided a different account of the events.

Defendants ask the court to consider their motion timely because the case management plan did not require motions and cross motions to be filed simultaneously (Defs.' Resp. 3-4) and because it will further the interest of judicial economy (*id.* at 4). They cite two cases in support. In an International Trade Court case, the judge noted that the defendant's cross-motion did not meet the scheduling deadline but declared the

"practice of combining the cross-motion for summary judgment with the party's response to the original motion for summary judgment [to be] an efficient use of court resources." *Rollerblade, Inc. v. United States*, 116 F. Supp. 2d 1247, 1250 n.1 (Ct. Int'l Trade 2000).  Likewise, in *Connecticut Indemnity Co. v. 21st Century Transport Co.*, 186 F. Supp. 2d 264, 269 (E.D.N.Y. 2002), the court declared that it was appropriate to consider an untimely filed cross-motion "for the simple reason that the cross-motion seeks summary judgment on the very same claims" for which the other party was moving for summary judgment.

The Seventh Circuit has generally accorded district courts wide latitude in managing their dockets, whether by enforcing a deadline or considering an untimely motion.  *See United States v. Coronado-Navarro*, 128 F.3d 568, 572 (7th Cir. 1997) (affirming a trial court's refusal to allow a collateral attack at trial when the court was prepared to consider the collateral attack by motion but the defendant failed to abide by its scheduling order); *Jones v. Coleman Co.*, 39 F.3d 749, 754-55 (7th Cir. 1994) (stating that judges have the power to control proceedings in their court and therefore upholding a magistrate judge's decision to consider an untimely motion despite former district court judge's decision denying leave to file it.)

Although the court finds that the Defendants blatantly ignored Magistrate Judge Baker's specific instructions, striking their cross summary judgment motion will only add to delay, which will serve neither party.  Moreover, although the parties may not have presented all the issues in the proper form, the material issues have been fully briefed with one exception.

10

In seeking summary judgment, Defendants argue, in two brief paragraphs, that Sgt. Kivett's due process claim should be dismissed because, as a matter of law, she is not entitled to any damages if she would have been fired anyway.  (Defs.' Brf. Opp'n 23.)[6]  This position is incorrect.  The Supreme Court has recognized that a person deprived of his or her constitutional right to due process is entitled to nominal damages of one dollar even if the government's action was justified.  *Carey v. Piphus*, 435 U.S. 247, 267 (1978).

> Because the right to procedural due process is "absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Id.* at 266 (citations omitted).

Moreover, as the case cited by Defendants points out, such a plaintiff may also collect damages traceable to the deficient procedure.  *See Alston v. King*, 231 F.3d 383, 386 (7th Cir. 2000).  "[T]he employee may still obtain damages for emotional distress attributable to the deficiencies in procedure if the employee can convince the trier of fact that the distress is attributable to the denial of procedural due process itself rather than to the justified termination."[7]  *Id.* (citing *Carey*, 435 U.S. at 263).  Thus, as *Carey* and

---

[6] Defendants' briefs, replies, and responses are labeled according to their headings in fact (although not necessarily as docketed) to the extent necessary to distinguish them from other filings.  Thus the one document entitled "Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Brief in Support of their Cross-Motion for Summary Judgment" is cited herein simply as "Defs.' Br. Opp'n."  Likewise, the document entitled "Defendants' Response to Plaintiff's Motion to Strike, and Reply Brief in Support of Defendants' Cross-Motion to Summary Judgment" is cited as "Defs.' Resp."

[7] Defendants acknowledge this exception but argue that it does not apply because Sgt.
(continued...)

*Alston* point out, Sgt. Kivett is not barred as a matter of law from collecting nominal damages as well as those damages traceable to the deficient procedure, even if Defendants can show that Sgt. Kivett would have been fired regardless.

In their reply brief – normally the last word – Defendants acknowledged that Sgt. Kivett might be entitled to nominal damages.  (Defs.' Resp. 12-13.)  However, they questioned for the first time Sgt. Kivett's ability to provide any proof of damages arising from any due process violations, and therefore asked the court to limit Sgt. Kivett's claim to nominal damages.  Given the procedural posture, in which Defendants have merged their response to Sgt. Kivett's motion with their cross summary judgment motion, mindful of Defendants' disregard for Judge Baker's orders, and pursuant to Federal Rule of Civil Procedure 16(f), the court finds that Defendants have not raised this request in a timely manner.

Case law supports this ruling.  As at the appellate level, where the failure to raise an argument until reply may result in a waiver, *see Marie O. v. Edgar*, 131 F.3d 610, 614 n.7 (7th Cir. 1997), the failure to raise a new and independent argument until a reply brief at summary judgment may result in the argument being waived, *Fairley v. Andrews*, 430 F. Supp. 2d 786, 800 n.6 (N.D. Ill. 2006) (stating that arguments raised

---

[7](...continued)
Kivett "received an opportunity to explain herself to Lt. Crowe" and "did not pursue her removal for several months."  (Defs.' Br. Opp'n 23 n.3.)  This assumes, however, that Sgt. Kivett did receive such an opportunity and that the delay in obtaining a hearing was attributable to Sgt. Kivett -- two of the very issues in question.

for the first time in a reply brief are waived because the nonmovant has had no opportunity to respond).

The court therefore **DENIES** Sgt. Kivett's motion to strike the Defendants' cross motion for summary judgment except in respect to the issue of damages, for which the court **GRANTS** Sgt. Kivett's motion to strike.

### B. Defendant's Motion to File Amendment to Cross Motion

On June 23, 2006, the Defendants filed a subsequent motion to file an amendment to their cross motion for summary judgment.  In this motion, they questioned for the first time whether Sgt. Kivett had a protected property interest in her job as a corrections officer.  Although this motion was even less timely than their initial cross motion, Defendants are correct that the court must address this issue regardless. The court therefore **GRANTS** Defendants' motion for leave to file their amendment.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of fact is material if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if a reasonable fact finder could find for the nonmoving party.  *Hottenroth v. Village of*

13

*Slinger*, 388 F.3d. 1015, 1027 (7th Cir. 2004).  If there is evidence that would allow a reasonable jury to return a verdict for the non-moving party, then summary judgment is not appropriate.  *Id.*

When deciding a motion for summary judgment, the court must consider all evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party.  *See Anderson*, 477 U.S. at 255.  The moving party "bears the initial responsibility" of identifying specific facts within the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  When a motion for summary judgment is made and properly supported, the non-moving party may not rest on the pleadings or denials but must set forth the specific evidence showing there is a genuine issue of material fact that requires a trial.  Fed. R. Civ. P. 56(e).  A mere scintilla of evidence will not do.  *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (citing *Anderson*, 477 U.S. at 252).

## IV.  DISCUSSION

As the summary judgment motions by the Plaintiffs and the Defendants make clear, several issues are ripe for judgment because the parties do not disagree about the facts.  Rather they disagree about the law that governs this case and its application.  Regarding the claim that Sheriff Anderson and the Department violated Sgt. Kivett's due process rights under the 14th Amendment, the parties disagree about whether, as a matter of law, Sgt. Kivett had a protected property interest in her continued employment, and if so, what process was required.  Regarding the claim that Sgt. Kivett has

14

presented a prima facie case of gender discrimination, the parties disagree about the legal requirements of "legitimate expectations" and "similarly situated employees," both ingredients for establishing a prima facie case.  The court will address Sgt. Kivett's due process claim first.

### A.  Due Process

The Fourteenth Amendment guarantees individuals the right to due process when a state or local government deprives them of life, liberty, or property.  U.S. Const. amend. XIV, § 1.  When a public employee claims therefore that he or she has been fired without due process, a court's first step is to determine if the employee had a protected property interest in employment.  *Lalvani v. Cook County*, 269 F.3d 785, 791 (7th Cir. 2001).  Public workers who serve only "at will" or at the pleasure of their employers may have a desire in continued employment but they do not have a property interest.  Employees have a property interest only when they have a legitimate claim of entitlement, usually arising by statute or contract.  *Id.*  Generally, this entitlement exists when "an employee cannot be denied employment unless specific conditions are met." *Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 589 (7th Cir. 1992).

Here, Defendants offer two reasons why Sgt. Kivett did not have a protected property interest in her job.[8]  First, they point to an Indiana statute that gives sheriffs the authority to remove special deputies at will.  (Defs.' Br. Supp. Mot. Amend 5.)  Second,

---

[8]  Defendants initially agreed that Sgt. Kivett had a protected property interest.  However, "a court is not bound to accept a concession when the point at issue is a question of law."  *Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005).

15

they assert that the language of the Agreement does not create a property right because the sheriff determines the department's rules and regulations and has the "ultimate authority" to discipline corrections officers.  (*Id.* at 6.)

    *1.  The Special Deputy Statute*

In Indiana, a sheriff may appoint both private and public employees as special deputies when the nature of their employment requires them to have police powers.[9] Ind. Code § 36-8-10-10.6(a).  He can limit their powers.  *Id.*  He determines the requirements for their training, education, and experience, subject to general minimum requirements.  *Id.* § 36-8-10-10.6(b).

The practice in Indiana of awarding persons special police powers dates back at least to the mid-1800s.  *See New Albany & Salem R.R. v. Grooms*, 9 Ind. 243 (Ind. 1857) (finding the authority for a sheriff's deputy to appoint another to do a particular act to be of common-law origin).  In 1971, however, the Indiana Legislature passed a law requiring all counties to adopt a merit plan for deputy sheriffs.  1971 Ind. Acts 942-43; *see also Murray v. Hamilton County Sheriff's Dep't*, 690 N.E.2d 335, 340-41 (Ind. Ct. App. 1997) (describing the development of the police merit boards).  Ten years later, the Legislature made clear that the property interests afforded by these merit plans did not apply to special deputies.  1981 Ind. Acts 300, as amended by 1981 Ind. Acts 3132-

---

[9]  Typically, sheriffs have used their special deputy appointment power to give police powers to private security guards and to augment their paid deputy ranks with volunteers.  *See, e.g.*, *Carty v. State*, 421 N.E.2d 1151, 1153 (Ind. Ct. App. 1981) (noting the widespread use by sheriffs of uncompensated special deputies to augment their forces).

33.  The following year, the Legislature amended the law again to mandate that in Marion County (the only county having a consolidated city), the sheriff appoint only special deputies to serve as county jail guards.  1982 Ind. Acts. 1589-1590.

Since then, the law governing special deputies in these respects has remained unchanged.  The relevant part of the statute reads:  "A  special deputy may be removed by the sheriff at any time, without notice and without  assigning any cause . . . . [I]n counties having a consolidated city, [the sheriff] shall appoint only special deputies to serve as county jail guards."  Ind. Code § 36-8-10-10.6(a), (f)(2).

The Defendants argue that because Sgt. Kivett was a special deputy, she could not have any expectation of continued employment.  (Defs.' Reply Supp. 3.)  According to the Defendants, the Legislature has directed that special deputies serve at will and therefore any provisions in the Agreement that purport to give Sgt. Kivett a property interest in her job are void as a matter of law.  (*Id.* at 5.)  Officials have no authority to vary the terms of a state ordinance.  *Heck v. City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993).

The issue, however, needs to be framed more narrowly.  The question is whether the statute prohibits sheriffs from granting property interests to special deputies in their employ.  This is, as far as the court can determine, a matter of first impression.  Cases cited by the Defendants are not on point.

 For example, *Indiana Civil Rights Commission v. Marion County Sheriff's Department*, 644 N.E.2d 913 (Ind. Ct. App. 1994), concerned the employment status of

17

a Marion County corrections officer fired in 1989, twelve years before the recognition of the Local.  There is no indication in the case of any collective bargaining agreement. The Indiana Court of Appeals' ruling was limited to the finding that the Legislature had afforded sworn merit deputies employment rights while non-merit deputies such as the plaintiff **may** be terminated at will.  *Id.* at 917.

In a similar manner, Defendants assert that a line of cases regarding the permissible scope of teachers' bargaining agreements stands for the proposition that a collective bargaining agreement cannot contravene state law or an express public policy of the Legislature.  (Defs. Reply Supp. 4-5 (citing *Mich. City Educ. Ass'n v. Bd. of Sch. Trs.*, 577 N.E.2d 1004 (Ind. Ct. App. 1991)*; Anderson Fed'n of Teachers Local 519 v. Alexander,* 416 N.E.2d 1327 (Ind. Ct. App. 1981).)  On this point the court agrees. However, this proposition and the cited cases do not necessarily dictate the conclusion that Defendants seek in this case.

Both *Michigan City Education Association* and *Anderson Federation* concerned the interpretation of the Certificated Education Employee Bargaining Act ("CEEBA"), a state law that expressly restricted the rights and interests that could be subject to collective bargaining.  *Mich. City Educ. Ass'n*, 577 N.E.2d at 1008 (declaring that CEEBA prohibited a school board from delegating its dismissal authority to an arbitrator); *Anderson Fed'n*, 416 N.E.2d at 1332-33 (finding a contract clause tying employment of non-union teachers to payment of a union fee to be invalid because CEEBA prohibited contract provisions that interfered with CEEBA's mandate that school boards remain responsible for hiring and discharging employees).  The courts were

18

guided also by the act's prologue which explicitly stated the Legislature's public policy goals in limiting the range of bargaining between teachers and school corporations. *Mich. City Educ. Ass'n*, 577 N.E.2d at 1006-1007; *Anderson Fed'n*, 416 N.E.2d at 1331. Moreover, in *Michigan City Education Association*, the court noted that, in the absence of an express prohibition, school boards were indeed free to limit their hiring and firing discretion by binding themselves to procedures and criteria. *Mich. City Educ. Ass'n*, 577 N.E.2d at 1008.

*Wencke v. City of Indianapolis*, 429 N.E.2d 295 (Ind. Ct. App. 1981), is of no more help to Defendants. In *Wencke*, a police lieutenant sought to enjoin his city employer from enforcing the state's mandatory retirement law. *Id.* at 296. At the time of his appointment to the police force, the mandatory retirement age had been seventy years, but the legislature subsequently lowered the age to sixty-five. *Id.* at 296-97. Although under the general rules of statutory construction, the later statute would normally govern, the court found that the earlier retirement age had been incorporated into the lieutenant's employment contract when he joined the force. *Id.* at 297. The court found therefore that the city's attempt to enforce the later statute was void because, as applied to the lieutenant, the law violated the federal and state constitutional provisions against the impairment of contractual obligations. *Id.*

This case does not involve an impairment of a contractual obligation because the special deputy statute was adopted prior to the Agreement. Defendants cite *Wencke*, however, because of the court's declaration that "[t]he terms and conditions of the contract include the relevant statutory provisions which exist at the time the contract is

19

made as if such provisions were expressly incorporated." *Id.* However, as in the school bargaining cases, *Wencke* concerns statutes that were framed in explicitly mandatory terms. The first statute declared that the city's public safety board "shall . . . have authority" to require any policeman to retire upon reaching seventy years of age; the second stated that a policeman "shall be required to retire from the force no later than the day of his sixty-fifth birthday." *Id.* at 296-97 (quoting Ind. Code § 19-1-1-1 (repealed 1981) and Ind. Code § 18-4-12-20.5 (repealed 1982)).[10]

The special deputy statute does not contain such mandatory language. Rather, it states that a special deputy "may be removed" by the sheriff at will. Ind. Code § 36-8-10-10.6(a). Sgt. Kivett argues that this language does not bar or limit the sheriff's authority to enter into a contract that restricts his right to fire an employee at will. The court agrees. By stating that a sheriff "may" remove a special deputy at any time, without notice, and without assigning any cause, the Legislature was clearly stating that special deputies were not merit deputies and could not claim the property rights that the Legislature had afforded merit deputies.[11] It was also clearly stating its determination that special deputies were presumptively at-will employees. It was not, however, restricting the Sheriff's right to bargain with non-merit employees. *See, e.g.*, *Lohorn v.*

---

[10] Although §19-1-1-1 was not expressly repealed until 1981, the later statute, §18-4-12-20.5, became law in 1975. *See Wencke*, 429 N.E.2d at 296-97.

[11] The statute regarding special deputies, § 10.6, falls within the general section of the Indiana Code establishing a merit system for regular deputies, sandwiched between the statute establishing classifications, qualifications and standards for regular deputies and the statute establishing disciplinary proceedings for regular deputies. Ind. Code § 36-8-10-10 to -11.

*Michal*, 913 F.2d 327, 336 (7th Cir. 1990) (remanding a case to determine if city ordinances created a basis for awarding a property interest even though state law allowed the demotion at issue).

Had the Legislature wished a different result, it could have used different language, either by specifically limiting a sheriff's bargaining authority as it limited a school board's bargaining power in CEEBA, or by writing the statute in mandatory terms stating, for example, that "a special deputy ***shall be removable*** by the sheriff at any time, without notice and without assigning any cause." As one Indiana court has noted, "[i]n statutory construction, it is just as important to recognize what a statute does not say as it is to recognize what it does say." *Gary/Chi. Airport Bd. of Auth. v. Maclin*, 772 N.E.2d 463, 472 (Ind. Ct. App. 2002). The statute does not restrict a sheriff from entering into a binding contract that limits his discretion in discharging deputies.

### 2. *Property Rights Arising Under the Agreement*

Property interests are protected by the Constitution but arise from "existing rules and understandings." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). More importantly, the sufficiency of these rules or understandings "must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 345 (1976). Thus, to establish a property interest in her job, Sgt. Kivett must show that the Agreement provided her with a claim of entitlement, recognized under state law, to continued employment.

21

Defendants concede that "as a general matter, a collective bargaining agreement may create a protected property interest." (Defs.' Reply Supp. 6.) Whether it does in fact is a matter of contract interpretation, and the court looks first to the provisions of the Agreement. *See Perry v. Sindermann*, 408 U.S. 593, 601-602 (1972); *see also Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995).

Even at first glance, the Agreement's provisions are ambiguous. The terms of art for conveying a property interest in employment are well known. All that is needed is language indicating that the employee cannot be terminated but "for cause." *See Lalvani*, 269 F.3d at 791. Such wording does not appear in the Agreement.

A "for cause" discharge is one basis for the loss of seniority rights in Article Three of the Agreement. (Agreement Article III § 4.) And Article Seven requires a termination to be based on a violation of the Department's rules and regulations. (*Id.* Article VII § 2.) However, the violation need only be "alleged" and the Agreement also gives the Sheriff the authority to change the rules and regulations at any time. (*Id.*) He need only discuss the rules and regulations beforehand with the Local. (*Id.*)

Clearly, in negotiating this agreement, labor and management were tiptoeing around the issue of creating a "for cause" working environment. Both sides walked away from the table, able to claim that they had advanced or preserved their interests but had left the resolution of property rights, if necessary, to the courts. That time has come. Under Indiana law, the court's ultimate goal in the interpretation of ambiguous

contracts is to give effect to the parties' intent.  *See Shorter v. Shorter*, 851 N.E.2d 378,

383-84 (Ind. Ct. App. 2006).

The primary issue is whether, given the language in the Agreement, the parties

intended to bring about substantive rules that limit the Sheriff's decision-making.  *See*

*Colburn*, 973 F.2d at 589-90 (citing *Wallace v. Robinson*, 940 F.2d 243, 247 (7th Cir.

1991)).  For Sgt. Kivett to prevail, the Agreement must do more than just set out a

process for her termination.  It must limit the Sheriff's discretion.  It must impose

conditions that to be met before she can be fired.  The court turns to examining the

contract in detail.

a.  Seniority Provisions

Article Three governs the seniority of corrections and jail control officers.  It sets

forth rules for determining seniority.  (Agreement Article III §§ 1-2.)  It requires the

posting of the seniority list and a procedure for correcting errors.  (*Id.* § 3.)  Lastly, it

limits the reasons for which seniority can be lost:

> Once a Corrections Officer acquires seniority it will only be lost if (a) the
> Corrections Officer **is discharged for cause**; (b) the Corrections Officer
> voluntarily resigns; (c) the Corrections Officer is transferred to a job outside of the
> bargaining unit and remains out of the bargaining unit in excess of six (6)
> months; (d) the Corrections Officer is laid off due to a lack of work and is not
> recalled within three (3) years, or (e) the Corrections Officer fails to return from
> layoff within ten (10) days after proper notice by certified mail to his last known
> address.

(*Id.* § 4 (emphasis added).)

The issue before the court is not whether these provisions create a property interest – this case is about Kivett's termination, not whether she lost seniority without due process – but whether these provisions are limited to seniority or extend to a corrections officer's job, creating a property interest in continued employment.  Sgt. Kivett argues that because she "could only lose her seniority based on a discharge **for cause** and such cause had to be based on an alleged violation of defendant department's rules and regulations, she indisputably had a protected property interest." (Pl.'s Br. Supp. 16 (emphasis in original).)

The Defendants respond that "placement on the seniority list relates to the length of an employee's employment in a given position and only effects such things as the ability to bid on jobs, certainly an issue of internal significance to the Union."  (Defs.' Reply Supp. 6.)  This is not entirely accurate.  Under Article Six, although the seniority list does not determine promotions, it does determine who must be offered positions within a rank.   "To fill vacancies in these positions . . . the most senior Corrections Officer who has submitted a bid for the vacant position shall be given the opportunity to accept the vacant position."  (Agreement Article VI.)  This is a matter of interest to the Defendants as well as the Local.

Read literally, the seniority provisions create a potential paradox.  A sheriff could dismiss a corrections officer arbitrarily and yet, under the terms of Article III, the officer would keep his seniority.  Yet, to fill a vacancy the following year, the Department would be required under Article Six to offer that former employee a job if he or she was the

24

most senior person.  This certainly was not the intent of the parties.  And if this were the only possible interpretation of the seniority provision, then the "discharge for cause" language would seem to indicate an intent to create a property interest.  *See Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003) (stating that a court should seek to ascertain the intent of the parties and accept an interpretation that harmonizes the provisions of the contract).

However, as Defendants' attorney noted in oral argument, the "discharge for cause" requirement makes sense if the provision carries with it an implied condition of employment.  This is not so bizarre as it might first appear, given the past history of patronage employment in Indiana.  A corrections officer who was dismissed arbitrarily by one sheriff might have hopes of regaining employment after the next election, and the Agreement would ensure that in such a case, that corrections officer would retain all his prior seniority upon rehire.  Under this interpretation, the seniority provisions do not create a property interest in continued employment.  The corrections officers' only entitlement, if any, is limited to seniority rank.

b.  Disciplinary Provisions

Article Seven governs the procedures for promotion, discipline, and layoffs. Specifically, it requires the sheriff to develop rules and regulations governing the conduct of corrections officers and uniform disciplinary procedures.  (Agreement Article VII § 2.)  It requires the sheriff to discuss the rules and regulations with the Local prior to

their adoption.  (*Id.*)  It requires that all disciplinary charges "shall be based on ***an alleged violation*** of the adopted rules and regulations."[12]  (*Id.* (emphasis added).)

These provisions do limit the sheriff's discretion, however slightly.  An employee cannot be dismissed without assigning a cause.  Moreover, the Agreement requires that discharge be based on an alleged violation of what is, in effect, a published rule and regulation.

Citing cases from other circuits, Defendants argue that, even if the employer must enumerate the grounds for a discharge, if the employer has complete discretion to adopt or change the grounds for firing, then the employee is really serving at the will or pleasure of that employer.  (Defs.' Br. Supp. 7.)  The court does not disagree, but this is not the situation in this matter.  Here, under the Agreement, if a corrections officer engaged in conduct of which the sheriff disapproved, the sheriff could not immediately change the rules and fire the officer for violating the new rule.  Rather, the sheriff would first have to discuss any new rule or regulation with the Local prior to its adoption.

Nothing in the contract strictly addresses the sequence in which the adoption of rules and the discharge of a corrections officer must occur.  However, a contract must

---

[12]  The section reads:
       The Sheriff shall develop rules and regulations governing the conduct of Corrections Officers and procedures to be applied in all disciplinary matters involving Corrections Officers.  Prior to the adoption of new rules and regulations, the Sheriff shall discuss the proposed rules and regulations with the Union.  However, the Sheriff retains the sole discretion to implement new rules and regulations following such discussion.  All disciplinary charges against a Corrections Officer shall be based on an alleged violation of the rules and regulations and shall be handled in accord with the procedures established by the Sheriff.
(Agreement Article VII § 2.)

be read as a whole "so as not to render any words, phrases, or terms ineffective or meaningless." *Starks Mech., Inc. v. New Albany-Floyd County Consol. Sch. Corp.*, 854 N.E.2d 936, 941 (Ind. Ct. App. 2006). If a sheriff, upon taking offense at an officer's conduct, could immediately propose a new rule, discuss it with the union and then fire the deputy for a violation of that rule, both the discussion and citation to the rule requirements would be rendered ineffective, if not meaningless. The intent of these provisions appear clear. An employee's discipline – Sgt. Kivett's firing – must be based on an alleged violation of rules already discussed with the union.

This does not lead, however, to the conclusion that the sheriff's discretion is limited, or that any substantive conditions have been imposed on his ability to fire an employee. Here, ambiguity revolves around the meaning of the word "alleged" – an ambiguity that neither party addressed.

In one possible reading, "alleged" would require the Sheriff to allege or state the violation upon which discharge is based but the adjective would not modify the noun "violation" any further. That is, it would not change the requirement that an employee could be discharged only upon committing an actual violation of the rules and regulations. This would limit the Sheriff's discretion. All discipline would have to be based on a violation of a Departmental rule and regulation that had been, at least in effect, "published' through prior discussion with the union. This would guarantee corrections officers some minimal prior notice of the misbehavior that could lead to termination. It would provide them an opportunity to mold their conduct in conformance with the rule. This is the minimum essence of a discharge-for-cause work environment.

27

The term "alleged," however, can also be read as simply requiring the Sheriff or the Department to provide a reason under the published rules for the employee's discipline.  Under this interpretation, it would not matter whether the employee had actually violated the rules; only that the officer be given the Department's explanation.  This, of course, would not limit the Sheriff's discretion to fire someone; only his discretion to do so without comment.  As the evidence indicates, even that is not much of a burden when the governing rules encompass such general principles of good employment as truthfulness, competency, efficiency, and compliance with other rules and orders.

In weighing these two competing interpretations, the court cannot disregard the special deputy statute, reflecting the Indiana Legislature's clear intent to make clear that special deputies are, presumptively, at-will employees.  Nor can it ignore the strength of the employment-at-will doctrine in Indiana.  *See Orr v. Westminster Village N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997) (stating that "in Indiana, the presumption of at-will employment is strong, and this Court is disinclined to adopt broad and ill-defined exceptions to the employment-at-will doctrine").  Negotiated against such a background, the parties to the Agreement did not create a discharge-for-cause work environment from such ambiguous language.  The negotiating parties knew, or should have known, more definitive terms would be required to give the corrections officers an entitlement to continued employment.  Something more was needed to overcome the general atmosphere employment-at-will in Indiana and the pointed legislative preservation of

28

that doctrine with respect to specific deputies.  As the Agreement itself declared, "The Sheriff shall have the ultimate authority to discipline any Corrections Officer."

For the reasons discussed above, the court finds that Sgt. Kivett did not have a protected property interest in her employment and that therefore the Defendants were not required under the Constitution to provide her with any procedural due process. The court **DENIES** Sgt. Kivett's motion for summary judgment and **GRANTS** the Defendants' Cross Motion for Summary Judgment on her § 1983 claim for a violation of the Fourteenth Amendment.

### 3.  Qualified Immunity and Departmental Liability

Before proceeding to Sgt. Kivett's gender discrimination claim, the court notes that even had it found a property interest, Sheriff Anderson would have been entitled to qualified immunity.  This doctrine protects officials from reasonable mistakes in judgment in the exercise of their duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 816-17 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Whether an official is entitled to qualified immunity should be determined as soon as possible.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Generally, the determination of qualified immunity requires two steps.  *Saucier  v. Katz*, 533 U.S. 194, 201 (2001).  First the court must determine whether the official's conduct, as alleged or supported by the plaintiff's evidence, would violate a constitutional right (and Sheriff Anderson's conduct would not, given that Sgt. Kivett has no property interest in her job).  If so, the court then determines whether the right was

29

clearly established in view of the "specific context of the case." *Id.* At the most basic level, an official is entitled to qualified immunity if his or her mistake "as to what the law requires is reasonable." *Id.* at 205.

Here, where this court interpreted, apparently for the first time, whether the Indiana special deputy statute allows a sheriff to grant correctional officers a property right in their employment, a correctional officer's right to invoke the constitutional protections of due process upon termination was not clearly established. While the law expects, even demands, that a public official be knowledgeable about the law governing his work, it does not expect him to be an expert in statutory and contract interpretation or legal analysis. Sheriff Anderson could reasonably have believe that, regardless of any contractual rights, a correctional officer was an at-will employee under Indiana law. Had the court found Sgt. Kivett to have had a property interest, the Sheriff was entitled to qualified immunity on any violations of her due process rights under the Fourteenth Amendment.[13]

### B. Title VII Claim

---

[13] Qualified immunity would not have let the Department off the hook because local governmental bodies do not enjoy qualified immunity from damages under § 1983 claims. *Hedge v. County of Tippecanoe*, 890 F.2d 4, 8 (7th Cir. 1989) (citing *Owen v. City of Independence*, 445 U.S. 622 (1980)). To hold the Department liable, Sgt. Kivett would had to have shown that the Department itself, through the execution of its policies or customs, caused the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). One way to do this is to show that a final policy-maker (a person whose acts can be said to represent official policy) causes the injury. *Id.* In Indiana, the sheriff is a final policymaker for his department. *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) (finding the sheriff to be the final policymaker under Indiana law for law enforcement in his or her particular jurisdiction).

Sgt. Kivett is seeking summary judgment on the issue that she has proven a prima facie case of sex discrimination under Title VII, 42 U.S.C. § 2002e *et seq.*  The Defendants are seeking summary judgment on the entirety of her Title VII claim.  (Defs.' Br. Opp'n 2.)  They argue that Sgt. Kivett has not provided direct or circumstantial evidence of any intent to discriminate against her on the basis of her gender.  (*Id.* at 12.) They dispute that she has or will be able to establish a prima facie case.  (*Id.* at 2.)  Nor, they say, is she able to prove that the Defendant's asserted reasons for firing her were pretextual.  (*Id.*)

To prevail on a Title VII claim, a plaintiff must show that he or she was a victim of intentional discrimination by either of two methods.  *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).  Generally these are described as the direct method and the indirect method.  *See Jordan v. City of Gary*, 396 F.3d 825, 831-32 (7th Cir. 2005); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000).

### 1.  Direct Method

Direct evidence generally requires an admission by the employer that his actions were based on a prohibited consideration.  *Radue*, 219 F.3d at 616.  However, circumstantial evidence, such as suspicious comments directed at a protected group or statistical evidence of disparate treatment, can also be used as a method of direct proof when it creates "a convincing mosaic" sufficient to let the trier of fact infer intentional discrimination.  *Jordan*, 396 F.3d at 832 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).

31

Sgt. Kivett has not responded to Defendants' motion for summary judgment on this issue.  Nor has this court found any evidence, from Sgt. Kivett or the Defendants, that even hints of an admission that Sgt. Kivett was fired because she was a woman or that her superiors engaged in the sort of behavior or talk from which a jury could infer an intent to discriminate against female corrections officers.

### 2. Indirect Method

Sgt. Kivett's claim therefore depends on the indirect method of establishing unlawful discrimination that the Supreme Court outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Although the plaintiff always bears the burden of persuasion regarding the issue of intentional discrimination, *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the Court in *McDonnell Douglas* framed a method of indirect proof in which the burden of production shifts between the plaintiff and defendant.

Under this often employed framework, the plaintiff must first prove, by a preponderance of the evidence, a prima facie case of intentional discrimination.  *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 900 (7th Cir. 2005).  If the plaintiff meets this burden, "a presumption of discrimination arises, and the employer must articulate a legitimate and non-discriminatory reason" for the employer's contested act.  *Id.* (citing *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)).  The burden then shifts back to the plaintiff to show that the employer's stated reasons were only a

pretext for discrimination – more specifically, a phony reason.  *Paul v. Theda Med. Ctr.*, 465 F.3d 790, 794 (7th Cir. 2006).

A plaintiff who establishes a prima facie case will obtain judgment in her or his favor if the employer fails to produce evidence of a nondiscriminatory reason.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 n.3 (1993).  Conversely, a plaintiff will not survive summary judgment if the defendant offers such a reason unless the plaintiff can rebut the explanation "by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual."[14]  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002).

a.  Prima Facie Case

The prima facie case is not intended to be a particularly onerous test but rather a means of eliminating the "most common nondiscriminatory reasons" for the adverse action.  *Burdine*, 450 U.S. at 253-54.  In sexual discrimination cases, to establish a prima facie case, a female plaintiff must usually show that  (1) she belongs to a protected class, (2) she was meeting her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) male employees similarly situated to her received more favorable treatment.  *Moser*, 406 F.3d at 900; *Jordan*, 396 F.3d at

_____

[14]  Other Seventh Circuit decisions state that the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext.  *See, e.g.*, *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 724 (7th Cir. 2005).  Given the summary judgment standard in which the court must consider all evidence and inferences in the light most favorable to the non-movant, these standards are not likely to be much different in practice when considering a defendant's summary judgment motion.

835.  Here, Sgt. Kivett and the Defendants agree that she belongs to a protected class and suffered an adverse employment action.  (*See* Defs.' Br. Opp'n 13.)  However, they disagree over whether she was meeting the Department's work expectations and whether she has shown that employees similarly situated to her received more favorable treatment.

Sgt. Kivett insists that she was meeting the Department's expectations at least until the incident involving Carter's release.  (Pl's Br. Supp. 30.)  However, the Seventh Circuit has repeatedly reminded plaintiffs that merely incanting the prima facie case is not sufficient; it must be established.  *Peele*, 288 F.3d at 327.  With regard to meeting the Department's expectation, Sgt. Kivett's evidence is minimal.

Sgt. Kivett points the court to her own testimony that she had never been accused of, or disciplined for, wrongfully releasing any other inmate prior to Carter. (*See* Kivett Dep. 124-25.)  But this does not establish the overall quality of her work.  In her briefing, Sgt. Kivett cited additional testimony of her own (*see* Pl.'s Br. Supp. 2 (citing Kivett Dep. 147-52)), but she did not submit these pages to the court.  Not surprisingly, the Defendants did not submit this omitted testimony, either.

She also points to Sheriff Anderson's testimony he was not aware of any other disciplinary issues involving Sgt. Kivett.  (*See* Anderson Dep. 7.)  However, this testimony also does not establish conclusively that her work prior to her discharge was satisfactory.  As the sheriff commented, Sgt. Kivett came to his attention only when Carter was released.  (*Id.*)

34

More problematic is the time period by which Sgt. Kivett's performance is to be judged. The Defendants assert that the record shows that Sgt. Kivett was not meeting the Department's expectations because she disobeyed a direct order and did not feel compelled to verify Carter's status despite his protests. (Defs.' Br. Opp'n 14.) These facts are disputed (*see* Pl.'s Reply Supp. 19-20), and this would negate Sgt. Kivett's prima facie case if the time period by which she is to be judged includes the day of Carter's release.

The Seventh Circuit has usually considered the relevant period to be the time of the adverse action. *See, e.g.*, *Peele*, 288 F.3d at 329. However, the prima facie case was never intended to be determined by a rigid formula with hard and fast rules as to what evidence should be considered. *Hong*, 993 F.2d at 1264 (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) and *Rowe v. Cleveland Pneumatic Co. Numerical Control, Inc.*, 690 F.2d 88, 97 (6th Cir. 1982)). In a case such as this one, where the employer has fired an employee for the very reasons that the employee claims are pretextual, the second and fourth prongs may merge to some extent. *Peele*, 288 F.3d at 329; *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) (stating that the issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext). Yet in these situations, the plaintiff's prima facie case must include "evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner." *Peele*, 288 at 329.

35

This brings the court to the fourth prong – whether Sgt. Kivett has established that similarly situated male employees received more favorable treatment.  Here she has pointed to one corrections officer, Richard R. Thomas, who was demoted from sergeant to officer following his involvement in his third wrongful release in nine months. (*See* Pl.'s Exs. 2, 32.)  (The Defendants' exhibits showing that six female officers, including two sergeants and a lieutenant, were also disciplined for involvement in wrongful releases and less severely than Sgt. Kivett may be relevant to the issue of pretext, but not Sgt. Kivett's prima facie claim.)  Such favorable treatment for Sgt. Thomas would satisfy the fourth prong if he were similarly situated.  Sgt. Kivett has not shown that he was.

Similarly situated does not mean exactly alike.  *Radue*, 219 F.3d at 618.  Nor is the Seventh Circuit standard cut in stone.  *See, e.g.*, *id.* (stating that the employee need not show complete identity but at least substantial similarity with the better treated employee); *but compare Jordan*, 396 F.3d at 835 (stating that the rule that an employee must be "directly comparable in all material respects" is well established in the Seventh Circuit).  Regardless of how the standard is worded, a court determines whether employees are similarly situated by considering factors such as whether the employees share the same job description and supervisor, have comparable qualifications such as experience and education, and work in jobs governed by the same standards.  *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003).  In disciplinary cases, the plaintiff should show that the other employee had engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the

employer's treatment of them." *Radue*, 219 F.3d at 617-18.  Normally, determining if employees are similarly situated is "fact intensive, requiring consideration of the circumstances as a whole."  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).

The problem with Sgt. Kivett's proferred example of a similarly situated employee is not that Sgt. Thomas was not comparable in some relevant characteristics.  He was.  The records show that he held the same rank, and as a corrections officer was presumably subject to the same rules and regulations.  (*See* Pl.'s Exs. 2, 32.)  The records also indicate that, at the time of his third disciplinary action, Lt. Crowe was one of his supervisors, given that she submitted a memorandum to a higher official outlining her investigation of Sgt. Thomas' transgression.  (Pl.'s Ex. 31.)  Moreover, the incident itself was similar.  Records indicated that the inmate in his case was to have been returned to a community corrections center.  *Id.*  Sgt. Thomas was the primary officer for determining whether the inmate should be released.  *Id.*

Defendants have identified two areas, however, where Sgt. Kivett's situation was not comparable.  First, Sgt. Kivett was charged with being untruthful, and Sgt. Thomas was not.  (*See* Pls. Ex. 24.)  Second, in Sgt. Kivett's case, the Department had at least some evidence showing that the inmate had warned Sgt. Kivett that he was not to be released. (*See* Pl.'s Ex. 8.)  As discussed above, the Department's belief that Sgt. Kivett had lied about Lt. Crowe's instructions was a major, if not the primary, factor in the decision to fire her.  Sgt. Kivett has not shown that Sgt. Thomas was a similarly situated employee.  She has not established her prima facie case.

37

b.  Pretext

Even were this court to find that Sgt. Kivett established a prima facie case, it would still have to dismiss her Title VII claim because she has not provided any evidence from which a reasonable jury could conclude that the Department's reasons for firing her were pretextual.  The next step in the *McDonnell Douglas* framework requires the Defendant to show a legitimate reason for Sgt. Kivett's firing.  Here, the Department has provided several reasons, all related to the release of an inmate from the Marion County Jail in violation of the Department's procedures.  In his February 27, 2004, termination letter, Sheriff Anderson listed what most persons would describe as an act of insubordination or deceit as one of the circumstances supporting the violations.[15]  (Defs.' Ex. I.)  Sheriff Anderson also subsequently testified that the inmate's own questioning of his release made her misconduct "blatant" and distinguished her act from other wrongful releases.  (Anderson Dep. 54.)

Under *McDonnell Douglas*, the burden returns to Sgt. Kivett to show that these reasons were phony, a cover-up for discrimination.  The means by which a plaintiff does this have been stated in several ways.  *See, e.g.*, *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) (stating that a plaintiff can show pretext by stating that the employer's reasons were factually baseless, not the actual reasons, or were insufficient to motivate the employer).  At its simplest formulation, however, the plaintiff establishes

---

[15]  The relevant sentence reads: "You wrote on Mr. Carver's [sic] Master Packet that there was 'no hold per Lt. Crow' after Lt. Crowe has specifically instructed you to check the inmate's status."  (Defs.' Ex. I.)

38

pretext by showing that the employers' reasons were lies or had no basis in fact. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999).

Sgt. Kivett has not offered any evidence indicating any lack of sincerity in the Defendants' stated reasons for firing her. Nor has she shown that the Defendants lacked a basis in fact. Rather, just the opposite. They did. The plaintiff's own exhibits show that Mr. Carter was to have been returned to Plainfield. The computer records showed a hold on him. Mr. Carter's transfer record contained a message that Plainfield was to be called. Under the Department's procedures, Mr. Carter should not have been released, and Sgt. Kivett acknowledges that she released him.

Sgt. Kivett's real beef lies with Lt. Crowe, not the Department. The gist of her claim is that Lt. Crowe ordered her to release Mr. Carter and, having realized a mistake was made, Lt. Crowe covered up her responsibility by lying to her superiors about her instructions to Sgt. Kivett.[16] For whatever reasons, the Department chose to believe Lt. Crowe, but this does not mean that the Department's decision to rely on its investigation, even if incomplete from Sgt. Kivett's perspective, was a lie or had no basis in fact. The Defendants may have been unwise in their failure to obtain Sgt. Kivett's story, but the court's only interest here is the due process issue that has already been addressed. As the Seventh Circuit has repeated numerous times, the court does not sit

---

[16] Sgt. Kivett has not presented any evidence showing that the Defendants delegated their disciplinary authority to Lt. Crowe. At best, she may have made a recommendation. Lt. Crowe testified that she could not remember if she made any recommendation regarding Sgt. Kivett's discipline. (Crowe Dep. 63.)

39

as a super personnel board, second-guessing the way the Defendants conducted their business.  *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

The court therefore **DENIES** Sgt. Kivett's motion for summary judgment on the issue of her prima facie case and will **GRANT** Defendants' motion for summary judgment on Sgt. Kivett's Title VII claim.

## V.  CONCLUSION

On preliminary issues, the court **DENIES** Sgt. Kivett's Motion to Strike Defendants' Cross-Motion for Summary Judgment (Doc. No. 62) except with respect to the issue of damages, on which Sgt. Kivett's Motion to Strike is **GRANTED**.  The court also **GRANTS** Defendants' Motion for Leave to File Amendment to Cross Motion for Summary Judgment (Doc. No. 68).

For the reasons discussed above, the court finds Sgt. Kivett was an at-will employee who did not have a property right in her continued employment and was not entitled under the Constitution to procedural due process protections upon discharge. The court also finds, with regard to her sex discrimination claim, that she has not established a prima facie case nor alleged any evidence suggesting that the Defendants' stated reasons for firing her were a pretext.

The court therefore **DENIES** Sgt. Kivett's Motion for Partial Summary Judgment (Doc. No. 46) and  **GRANTS**  Defendants' Cross Motion for Summary Judgment (Doc.

40

No. 49).  Judgment will be entered by a separate order.  However, in light of the

Defendants' disregard for the deadlines set by Magistrate Judge Tim A. Baker, costs will

not be awarded to the Defendants.

ALL OF WHICH IS ENTERED this 22nd day of March 2007.

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge Tim Baker

Timothy V. Clark
ccfnattys@aol.com

Allison Wells Gritton
OFFICE OF CORPORATION
COUNSEL
agritton@indygov.org

Anthony W. Overholt
LOCKE REYNOLDS LLP
aoverholt@locke.com

Robin C. Clay
OFFICE OF CORPORATION
COUNSEL
rclay@indygov.org

Kevin C. Schiferl
LOCKE REYNOLDS LLP
kschiferl@locke.com